**Ahmad BARAVATI, Plaintiff–Appellee,**

v.

**JOSEPHTHAL, LYON & ROSS, INCORPORATED, and Peter Sheib, Defendants–Appellants.**

**No. 93–3647.**

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1994.

Decided July 1, 1994.

---

Judson H. Miner, Barack H. Obama (argued), Davis, Miner, Barnhill & Galland, Chicago, IL, for plaintiff-appellee.

M. Jayne Rizzo, Kelley, Drye & Warren, Chicago, IL, Michael L. Hirschfeld (argued), Kelley, Drye & Warren, New York City, for defendant-appellant.

Before POSNER, Chief Judge, BAUER, Circuit Judge, and TINDER, District Judge.*

POSNER, Chief Judge.

Ahmad Baravati was employed as a broker in the Chicago office of Josephthal, Lyon & Ross, Inc. (JLR), a New York securities firm that is a member of the National Association of Securities Dealers. JLR fired Baravati. The NASD requires that whenever a broker is terminated, the member firm that employed him must fill out and submit to the association a termination notice form (form U–5), which the NASD retains and makes available to any member who wants information about the broker, perhaps because he has applied for a job with the member. The form asks the reason for the termination. The reason JLR listed was that Baravati was "under investigation by [JLR] for the fraudulent and wrongful taking of firm property in the amount of $7,650.25." The parties agree that Baravati's contract with JLR required disputes, tortious as well as contractual, arising under the contract to be arbitrated in accordance with the NASD's Code of Arbitration Procedure. (Submission of disputes to arbitration is now a required term in employment contracts with members of NASD. *Kresock v. Bankers Trust Co.*, 21 F.3d 176, 178–79 (7th Cir.1994).) Contending that the reason stated in the U–5 for firing him was false and defamatory—that in

* Hon. John Daniel Tinder of the Southern District of Indiana.

fact he had been fired in retaliation for blowing the whistle to the SEC about fraud committed by JLR on its customers—Baravati, like a number of similarly situated brokers lately (see Edward Felsenthal, "Filings about Brokers' Departures Made by Firms Spark Libel Suits," *Wall St. J.*, April 14, 1994, p. B2), invoked the arbitral process. The arbitrators found that he had been defamed and awarded him $60,000 in compensatory damages and $120,000 in punitive damages. Baravati went to district court to enforce the award, 9 U.S.C. § 9, and won. 834 F.Supp. 1023 (N.D.Ill.1993). JLR appeals.

■ Judicial review of arbitration awards is tightly limited; perhaps it ought not be called "review" at all. By including an arbitration clause in their contract the parties agree to submit disputes arising out of the contract to a nonjudicial forum, and we do not allow the disappointed party to bring his dispute into court by the back door, arguing that he is entitled to appellate review of the arbitrators' decision. *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 369, 98 L.Ed.2d 286 (1987); *Chicago Typographical Union v. Chicago Sun–Times, Inc.*, 935 F.2d 1501, 1504–06 (7th Cir.1991); *Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry.*, 768 F.2d 914, 921 (7th Cir. 1985). There are, nevertheless, limited grounds on which an arbitral award can be set aside, such as that the arbitrators "exceeded their powers." 9 U.S.C. § 10(a)(4).

A number of courts, including our own, have said that they can set aside arbitral awards if the arbitrators exhibited a "manifest disregard of the law." *Health Services Management Corp. v. Hughes*, 975 F.2d 1253, 1267 (7th Cir.1992); *Todd Shipyards Corp. v. Cunard Line, Ltd.*, 943 F.2d 1056, 1060 (9th Cir.1991); Note, "Vacatur of Commercial Arbitration Awards in Federal Court: Contemplating the Use and Utility of the 'Manifest Disregard' of the Law Standard," 27 *Ind.L.Rev.* 241, 251–54 (1993). Two courts, however, have declined to adopt this formula, *Ainsworth v. Skurnick*, 960 F.2d 939, 940–41 (11th Cir.1992) (per curiam); *Stroh Container Co. v. Delphi Industries, Inc.*, 783 F.2d 743, 750 (8th Cir.1986),

though without rejecting it. Two have criticized it. *Raiford v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 1410, 1412–13 (11th Cir.1990); *I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424, 430–31 (2d Cir.1974). The criticisms are marshaled and endorsed in the excellent student note in the *Indiana Law Review*. The formula is dictum, as no one has found a case where, had it not been intoned, the result would have been different. It originated in *Wilko v. Swan*, 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953) (see *Drayer v. Krasner*, 572 F.2d 348, 352 (2d Cir.1978) (Friendly, J.))—a case the Supreme Court first criticized for its mistrust of arbitration and confined to its narrowest possible holding, *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 231–34, 107 S.Ct. 2332, 2340–41, 96 L.Ed.2d 185 (1987), and then overruled. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 485, 109 S.Ct. 1917, 1922, 104 L.Ed.2d 526 (1989). Created *ex nihilo* to be a nonstatutory ground for setting aside arbitral awards, the *Wilko* formula reflects precisely that mistrust of arbitration for which the Court in its two *Shearson/American* opinions criticized *Wilko*. We can understand neither the need for the formula nor the role that it plays in judicial review of arbitration (we suspect none—that it is just words). If it is meant to smuggle review for clear error in by the back door, it is inconsistent with the entire modern law of arbitration. If it is intended to be synonymous with the statutory formula that it most nearly resembles—whether the arbitrators "exceeded their powers"—it is superfluous and confusing. There is enough confusion in the law. The grounds for setting aside arbitration awards are exhaustively stated in the statute. Now that *Wilko* is history, there is no reason to continue to echo its gratuitous attempt at nonstatutory supplementation. So it will be enough in this case to consider whether the arbitrators exceeded their powers.

■ JLR makes two points (the third, that Baravati waived his right to complain about being defamed, is frivolous and need not be discussed). The first is that under the law of Illinois the contents of the U–5 form

that JLR filled out and submitted to the NASD are, like a pleading, testimony, exhibit, or opinion, absolutely privileged as a communication made in a judicial or quasi-judicial proceeding. The law of *Illinois?* Confirmation of the arbitrators' award was sought under Title 9 of the U.S.Code, the Federal Arbitration Act. Yet one might think that in a case such as this, where the basis of federal jurisdiction is diversity of citizenship rather than the existence of a federal question (as it would be if, for example, an arbitration award based on a collective bargaining contract subject to section 301 of the Taft–Hartley Act, 29 U.S.C. § 185, were sought to be enforced), substantial constitutional questions would arise if the federal courts tried to create a body of substantive law to be applied by the arbitrators. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), holds that the conferral by Article III of the Constitution of diversity jurisdiction on the federal courts does not authorize them to create substantive law to govern the disputes arising under that jurisdiction. The Federal Arbitration Act, however, is limited to diversity cases *that affect interstate commerce,* 9 U.S.C. §§ 1, 2, a basis of federal lawmaking jurisdiction. *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 201–02, 76 S.Ct. 273, 275, 100 L.Ed. 199 (1956); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 405, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967). The Act therefore can, and the Supreme Court has held that it does, authorize the federal courts to create a federal substantive law of arbitration to apply in cases under the Act. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25 and n. 32, 103 S.Ct. 927, 941–42 and n. 32, 74 L.Ed.2d 765 (1983); *Southland Corp. v. Keating,* 465 U.S. 1, 11–16, 104 S.Ct. 852, 858–61, 79 L.Ed.2d 1 (1984).

A standard way in which federal courts make federal common law is by adopting the law of the state whose law would govern in the absence of federal law, subject to the implicit proviso that the adopted state law be consistent with federal policy. The states have richer bodies of common law than the federal courts do and it is desirable to minimize the number of different legal rules to which people are subject. *Powers v. United States Postal Service,* 671 F.2d 1041 (7th Cir.1982). So if we started with federal common law we might end up with Illinois law after all. But there is a more direct route. This case is unusual because the arbitrators, rather than being called upon to interpret a contract, their usual function, were called upon to determine whether one party had defamed the other. (There is, as we said, no contention that they were not empowered by the parties' contract to do so.) Defamation is an area of state law, and the various defamation privileges are an integral part of the law of defamation. It would be surprising if in authorizing the arbitration of their disputes the parties had intended the arbitrators to *make up* a law of defamation to apply to those disputes. More likely they were expected to apply the defamation law of some state, and Illinois is as plausible a candidate as any, since Baravati worked in JLR's Chicago office. So let us apply the Illinois law of privilege.

That is easier said than done. *Fahnestock & Co. v. Waltman,* 935 F.2d 512, 516–17 (2d Cir.1991), rejected a claim of privilege on facts similar to ours, but it was not an Illinois case—there is no Illinois case on the question—and the court's brief discussion suggests that the arbitrators were correctly applying New York law. It might seem obvious and therefore in need of no authority that arbitrators may not disregard established legal privileges and immunities. Privileges and immunities limit the powers of adjudicative bodies because of concerns believed to override the interest in allowing such bodies to consider all probative evidence and render decisions that vindicate the rights of injured parties. The absolute privilege for defamation based on judicial and quasi-judicial communications is closely related to the absolute immunity of judges, legislatures, prosecutors, and witnesses; in fact it overlaps all those immunities. *Briscoe v. LaHue,* 460 U.S. 325, 330–36, 103 S.Ct. 1108, 1113–15, 75 L.Ed.2d 96 (1983). Without it the collection and examination of evidence would be hampered, because lawyers, litigants, witnesses, and judges would be fearful of being sued for defamation on the basis of their

submissions, arguments, testimony, or rulings. The absolute privilege is recognized in Illinois, *McGrew v. Heinold Commodities, Inc.*, 147 Ill.App.3d 104, 100 Ill.Dec. 446, 454, 497 N.E.2d 424, 432 (1986), and was extended to quasi-judicial bodies in *Allen v. Ali*, 105 Ill.App.3d 887, 61 Ill.Dec. 678, 435 N.E.2d 167 (1982), which involved the state supreme court's attorney disciplinary body. And yet it is far from plain that to allow arbitrators, alone of dispute resolvers, to disregard the privilege would undermine it. The privilege is, we may assume, waivable (other privileges are, and we cannot see why this one should be an exception, though we can find no cases on the question), and consent to arbitration could be thought a waiver if it is the practice of arbitrators not to honor the absolute privilege. The parties have not told us whether it is or not.

We need not wrestle this issue to the ground. JLR could not in any event assert the absolute privilege under the facts of this case. This is true even though federal securities law gives NASD quasi-judicial responsibilities. Those laws impose duties of self-regulation on stock exchanges and on, what is functionally the same thing, dealer associations in the over-the-counter markets. 15 U.S.C. § 78o-3; *SEC v. Waco Financial, Inc.*, 751 F.2d 831, 832 (6th Cir.1985); Louis Loss, *Fundamentals of Securities Regulation* 620–24 (2d ed. 1988). We may assume that when the NASD in the discharge of these duties investigates or adjudicates or imposes sanctions with respect to suspected violations of the rules that it enforces, the participants in those proceedings are entitled to the absolute privilege to the same extent as in judicial proceedings. Cf. *Kalish v. Illinois Education Ass'n*, 157 Ill.App.3d 969, 110 Ill.Dec. 72, 510 N.E.2d 1103 (1987). But the submission of a U–5 form and its transmission (upon request) to members of the NASD are not stages in the association's quasi-judicial regulatory process. In the first instance they are the means by which the NASD administers an employment clearinghouse. By revealing the reason for the termination the form gives other members of the association potentially valuable information concerning the availability and suitability of potential employees. This information

service is remote from a judicial proceeding; and while a U–5 can trigger an investigation or even serve as evidence in a disciplinary proceeding against a member or broker, any item of information could do that. To insulate the members from liability for the contents of their U–5s would be tantamount to allowing a member of the NASD to blackball a former employee from employment throughout the large sector of the industry that the membership of the association constitutes. (About half of all registered broker-dealers belong to it.)

We must not overdramatize. The employee can seek to clear his name by asking the NASD to investigate or by invoking the arbitral process, as Baravati did; in fact, the defendants told us without contradiction, Baravati found employment with another member firm; and securities firms will be reluctant to give reasons for a termination that might scare their clients, although we do not know to what extent U–5s circulate outside the brokerage houses themselves. So the sky would not fall if the privilege were allowed to bar the kind of relief sought by Baravati. What is more, since the members are *required* to state the reason for termination on the U–5, denial of the privilege puts them in a hard place, where if they state a reason discreditable to the employee they may be sued for libel while if they lie about the reason they will be violating the association's rules. *NASD Manual* ¶ 1153 (C.C.H. 1993) (art. IV, § 3(a) of NASD's by-laws). But it is only the *absolute* privilege that is in issue in this case. All concede that, just as in the case of an employer's character reference, the firm has a qualified privilege to defame the employee on the U–5, a privilege forfeited (under Illinois law) only if the firm knows or is reckless in failing to discover that it is defaming him falsely. *Mittelman v. Witous*, 135 Ill.2d 220, 142 Ill.Dec. 232, 239–40, 552 N.E.2d 973, 980–81 (1989). An absolute privilege is strong medicine, and we do not think that JLR has made a case for extending it beyond the judicial and quasi-judicial context and into the termination notice, even if the privilege is not waived in advance by consent to have disputes resolved by arbitrators rather than by courts.

JLR's second argument is that the arbitrators exceeded their powers in awarding punitive damages. NASD's Code of Arbitration Procedure, incorporated by reference in the contract between Baravati and JLR, requires arbitrators to provide "a summary of ... the damages and other relief awarded," but contains no other reference to the arbitrators' remedial powers. *Mastrobuono v. Shearson Lehman Hutton Inc.*, 20 F.3d 713 (7th Cir.1994), holds that if the body of law that the parties agreed would govern their disputes forbids arbitral awards of punitive damages in that class of case, a federal court cannot confirm the award. The contract specified New York law, which forbade arbitral awards of punitive damages in the type of dispute that had arisen and had been submitted to arbitration, so we held that the arbitrators' award of punitive damages could not be confirmed.

*Mastrobuono* put us in conflict with four other circuits, which hold that such a choice of law designation does not override the power of arbitrators to award punitive damages, provided the rules that the parties have agreed are to govern the arbitration authorize the arbitrator, implicitly or explicitly, to award such damages. *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1387 (11th Cir.1988); *Raytheon Co. v. Automated Business Systems, Inc.*, 882 F.2d 6 (1st Cir.1989); *Todd Shipyards Corp. v. Cunard Line, Ltd.*, supra, 943 F.2d at 1061–63; *Lee v. Chica*, 983 F.2d 883, 887–88 (8th Cir.1993); see also *J. Alexander Securities, Inc. v. Mendez*, 17 Cal.App.4th 1083, 21 Cal.Rptr.2d 826 (1993), and Justice O'Connor's dissent from the denial of certiorari in *Mendez*, —— U.S. ——, 114 S.Ct. 2182, 128 L.Ed.2d 901 (1994). The rules of the American Arbitration Association, which were applicable in those cases, authorize arbitrators to award "any remedy which [is] just and equitable and within the scope of the agreement," and this was deemed authorization enough for the awarding of punitive damages. These courts, however, would enforce a provision in an arbitration clause that *forbade* the arbitrator to award punitive damages; and if, as we thought was the situation in *Mastrobuono*, the parties do the same thing by invoking a body of law that contains such a prohibition,

there would be no greater reason to refuse to honor their choice. Indeed, short of authorizing trial by battle or ordeal or, more doubtfully, by a panel of three monkeys, parties can stipulate to whatever procedures they want to govern the arbitration of their disputes; parties are as free to specify idiosyncratic terms of arbitration as they are to specify any other terms in their contract. Cf. *Rashid v. Schenck Construction Co.*, 190 W.Va. 363, 438 S.E.2d 543, 547 (1993); *Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 129 N.J. 479, 610 A.2d 364, 369 (1992), overruled on other grounds in *Tretina Printing, Inc. v. Fitzpatrick & Associates, Inc.*, 135 N.J. 349, 640 A.2d 788 (1994); *Astoria Medical Group v. Health Ins. Plan*, 11 N.Y.2d 128, 227 N.Y.S.2d 401, 403, 182 N.E.2d 85, 87 (1962). For that matter, parties to adjudication have considerable power to vary the normal procedures, *DDI Seamless Cylinder Int'l, Inc. v. General Fire Extinguisher Corp.*, 14 F.3d 1163 (7th Cir.1994), and surely can stipulate that punitive damages will not be awarded. The difference between *Mastrobuono* and the contrary decisions is simply a difference over the proper interpretation of the choice of law clause read in light of the parties' agreement to have their disputes arbitrated under rules that allow for the award of punitive damages. The other circuits believe that these provisions are best reconciled by confining the choice of law provision to substantive matters, allowing the arbitrators free rein in procedural and remedial matters.

This disagreement does not bear directly on the present case, however, where there is neither a choice of law provision nor a provision in the governing arbitration rules concerning the scope of the arbitrators' remedial powers. We have suggested that if the court asked to enforce (or set aside) the arbitrators' award had occasion to apply federal common law to some dispute (say over arbitrability), it might well look to Illinois law for guidance. That is a different question from whether the *arbitrators* were required to look to Illinois law for guidance or remedies. The contract involved in the *Mastrobuono* case *told* the arbitrators to apply New York law, and the question was whether this

meant remedial (as we thought, and the other circuits do not) as well as substantive law. There is no similar directive in this case. We hesitate to infer one. It is commonplace to leave the arbitrators pretty much at large in the formulation of remedies, just as in the formulation of the principles of contract interpretation. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); *Miller Brewing Co. v. Brewery Workers*, 739 F.2d 1159, 1163 (7th Cir.1984); *Chameleon Dental Products, Inc. v. Jackson*, 925 F.2d 223, 225 (7th Cir.1991); *Willoughby Roofing & Supply Co. v. Kajima International, Inc.*, 776 F.2d 269 (11th Cir.1985) (per curiam). So far as appears, that is what the parties intended here. No negative inference can be drawn from the failure of the NASD's Code of Arbitration Procedure to say anything about the scope of the arbitrators' powers. Silence implies—given the tradition of allowing arbitrators flexible remedial discretion—the absence of categorical limitations. Since that is the norm, we assume that the parties would have said something in the arbitration clause had they wanted to depart from it.

Occasional statements that punitive damages are disfavored in arbitration, see, e.g., *Miller Brewing Co. v. Brewery Workers, supra*, 739 F.2d at 1164, must be read in context. Most arbitrations concern contract interpretation, and it is untraditional and still infrequent to award punitive damages for breach of contract. "[T]he traditional unavailability of punitive or exemplary damages in arbitration ... can be traced to the common law notion that punitive damages are not available in the standard action for breach of contract." Marvin F. Hill, Jr. & Anthony V. Sinicropi, *Remedies in Arbitration* 436 (2d ed. 1991). Here we have the unusual case of a tort arbitration, and punitive damages are commonly awarded for certain torts, including defamation subject to constitutional limitations not here invoked.

It remains to consider whether Illinois has a policy limiting the award of punitive damages by arbitrators that we should adopt as part of the federal common law of arbitration applicable to disputes that would be governed by Illinois law were they not within the purview of the Federal Arbitration Act.

*Fahnestock & Co. v. Waltman, supra*, held that New York's common law rule forbidding arbitrators to award punitive damages governed in an arbitration under the Federal Arbitration Act when, as in the present case, the arbitration was not being conducted under rules authorizing such relief. There was no question that that *was* New York's rule. We have only one Illinois decision, *Edward Electric Co. v. Automation, Inc.*, 229 Ill. App.3d 89, 171 Ill.Dec. 13, 22–23, 593 N.E.2d 833, 842–43 (1992); it is based entirely on the New York rule; and it has been narrowly interpreted in the only case to cite it. *Board of Education v. Illinois Educational Labor Relations Board*, 247 Ill.App.3d 337, 187 Ill. Dec. 61, 69 n. 4, 617 N.E.2d 269, 277 n. 4 (1993). *Edward* holds that arbitrators may not award punitive damages unless the contract authorizing arbitration expressly authorizes such awards. It did not do so here. *Edward* is a contract case, not a tort case, and we cannot be certain that the outcome would have been the same had it been a case in which punitive damages would have been a normal remedy for a court to award; for if a court, why not a panel of arbitrators, if that was the parties' own preferred tribunal? More fundamentally, we do not think that a state policy based, as the rule announced in the *Edward* decision is, on mistrust of arbitrators is a plausible candidate for incorporation into the federal common law of arbitration. The Federal Arbitration Act proceeds on the opposite premise, as the *Shearson/American* cases make clear. Close questions concerning the interpretation of the scope of the powers authorized to the arbitrator are resolved in favor of those powers. That is the teaching of the anti-*Mastrobuono* cases that we cited earlier, and the disagreement between those cases and *Mastrobuono* is not over the principle but over its application. Even if *Edward* is a correct statement of Illinois law, it is not a correct interpretation of the Federal Arbitration Act. In arbitrations governed by that Act, arbitrators are authorized to award punitive damages unless the parties have withdrawn that power, which they have not done here. *J. Alexander Securities, Inc. v. Mendez, supra*, 21 Cal.Rptr.2d at 831.

Although *Fahnestock* is distinguishable from the present case, we will not be coy and

attempt to conceal our disagreement with it. Not only is a rule forbidding arbitrators to award punitive damages an implausible candidate for incorporation into the federal common law of arbitration, but *Fahnestock* appears to hold that state common law of arbitration governs cases under the Federal Arbitration Act unless the parties have expressed their intentions not to be bound by it, as by subscribing to rules of arbitration that authorize the award of relief barred by the common law. At that point, the court seems to have thought, federal common law would spring back into place. We don't agree. State common law hostile to arbitration is preempted by federal common law friendly to it.

Of course if the Illinois law of *defamation* did not authorize the award of punitive damages in a case such as this, the arbitrators would be bound if we are correct that the parties' agreement was that the arbitrators would apply the law of some state, plausibly Illinois's, to tort claims arising out of the employment relation. That is not argued. The argument is that Illinois has some special rule concerning the award of punitive damages by arbitrators in any class of case. Such a rule, if it exists, is preempted by the Federal Arbitration Act.

The arbitrators' award was lawful, and the judgment of the district court is therefore

AFFIRMED.